John SINCLAIR, Lawrence "Pun"
Plamondon, John Waterhouse
Forrest, Appellants,

v.

Richard G. KLEINDIENST et al.

No. 79–2010.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 27, 1980.
Decided March 9, 1981.

David G. Lubell, Newark, N. J., for appellants.

Larry L. Gregg, Atty., Dept. of Justice, Washington, D. C., with whom Alice Daniel, Asst. Atty. Gen., and Robert E. Kopp, Atty., Dept. of Justice, Washington, D. C., were on the brief, for appellees.

Before LUMBARD *, United States Senior Judge for the Second Circuit, MIKVA and GINSBURG, Circuit Judges.

Opinion for the Court filed by Senior Circuit Judge LUMBARD.

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

LUMBARD, Senior Circuit Judge:

Plaintiffs John Sinclair, Lawrence "Pun" Plamondon, and John Forrest appeal from an order of the District Court for the District of Columbia which granted summary judgment for defendant John Mitchell and denied the plaintiff's motion to join new defendants and conduct further discovery. We agree with Judge Gasch's holding that Mitchell was protected by qualified immunity, and thus we affirm the district court's grant of summary judgment in favor of Mitchell. We see no reason, however, to restrict the joinder of new defendants whose possible implication was indicated by newly revealed evidence, and we reverse that portion of the order.

The plaintiffs seek remuneration for alleged constitutional violations stemming from F.B.I. telephone surveillance that occurred while Mitchell was Attorney General. Six occasions of telephone surveillance—involving the Black Panther Party in Berkeley and San Francisco, California, between February and July 1969—came to light in criminal proceedings against these plaintiffs. A second set of surveillances—involving the White Panther Party in Ann Arbor, Michigan, from September 1970 until January 1971—were not revealed until a Freedom of Information Act disclosure in January 1978.

The criminal proceeding that revealed the Black Panther Party surveillance culminated in *United States v. United States District Court*, 407 U.S. 297, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972) (hereinafter *Keith*)[1], which was a collateral challenge to the admissibility of those surveillance transcripts. All three plaintiffs in this case were defendants in those criminal proceedings. Plamondon was charged with the dynamite bombing of an office of the Central Intelligence Agency in Ann Arbor, and all three were charged with conspiring to destroy government property in violation of 18 U.S.C. § 371. In an affidavit filed by then Attorney General Mitchell, the government

1. The case takes its common name from District Judge Damon Keith who had issued the order that the government was challenging.

acknowledged that its agents had wiretapped some of Plamondon's conversations. The government asserted that the wiretaps were aimed at collecting information necessary to protect the nation's internal security and therefore, even though no warrant was obtained, were within the President's power to protect national security.

The Supreme Court, however, held in *Keith* that the warrantless domestic-security wiretaps of the Black Panther Party violated the Fourth Amendment. 407 U.S. at 323–24, 92 S.Ct. at 2139–40. Rather than disclose to Plamondon the contents of the illegally intercepted conversations, the government then moved to dismiss the indictment.

The plaintiffs subsequently initiated this suit on March 29, 1973—against the United States, Richard Nixon, Richard Kleindienst, Patrick Gray, and Mitchell—based on the Fourth Amendment and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520 (1970). On April 6, 1973, the district court dismissed the action as to then President Richard Nixon. On April 30, 1975, the court granted the remaining defendants' motion to dismiss on grounds of qualified immunity. This court, however, summarily reversed that order, holding that dismissal on immunity grounds was improper as reasonable discovery had not yet been completed. *Sinclair v. Kleindienst*, 645 F.2d 1080, (D.C.Cir. 1976).

On remand, the district court dismissed the plaintiffs' Title III claim in September of 1977 and allowed the parties to proceed with discovery on the Fourth Amendment claim. Although the plaintiffs requested documents and submitted interrogatories, they did not depose any of the defendants. The limited discovery that was completed revealed Mitchell's limited, supervisory role in the Black Panther Party surveillance and his motivations for authorizing it. Although there was no judicially imposed reasonableness requirement for national security wiretaps at the time, Mitchell adopted some internal restraints through two minimization memoranda. On May 6, 1969, he

required that future surveillance requests from federal agencies should provide sufficient information to enable him to evaluate the request. That memorandum also imposed time restraints and limited the dissemination of surveillance information.

The second memorandum, dated July 14, 1969, prohibited the interception of conversations between defendants and their attorneys in federal criminal cases. The express purpose of the limitation was to avoid intrusions into defendants' Sixth Amendment rights. It also provided specific procedures to avoid dissemination, even within the F.B.I., of any extraneous conversations accidentally overheard. Under the requirements of this second minimization memorandum, the White Panther Party wiretaps which included conversations between Sinclair and his attorney should never have been monitored.

Discovery also revealed memoranda from J. Edgar Hoover, Director of the F.B.I., to Mitchell seeking authorization for the Black Panther Party wiretaps between January and June of 1969. Those memoranda recited the violent goals and achievements of the organization, as well as its contacts with foreign revolutionaries and American dissident groups. Similar concerns for national security were corroborated by contemporaneous findings of a Congressional committee. H.R.Rep. 92–470, "Gun-Barrel Politics: The Black Panther Party, 1966–71," 92d Cong., 1st Sess. (1971). The Black Panthers had advocated violence against police, military officers, and the President, and had carried out attacks upon public buildings and police stations. As stated in his sworn answers to interrogatories, Mitchell believed that the Black Panther Party intended to "form a coalition with third world powers to force a settlement on the United States." He asserted that Party members had traveled to Cuba, Canada, Japan, and Scandinavian countries for meetings with representatives of North Vietnam, the Vietcong, the People's Republic of China, the Soviet Union, and other communist nations. Finally, he believed that the security threat was heightened by the

Black Panther Party's contacts with other violent organizations including the White Panther Party.

While discovery on the Fourth Amendment claim continued, plaintiff Sinclair obtained documents in January of 1978 through a Freedom of Information Act request that revealed the second series of F.B.I. surveillances—wiretaps of the White Panther Party. The defendants' answers to interrogatories had never revealed the White Panther Party wiretap because the government's three examinations of F.B.I. surveillance indices had not revealed those overhearings. In October of 1978, the plaintiffs moved to serve additional interrogatories to investigate the White Panther Party surveillance; they did not, however, move to reestablish their Title III claim. The defendants opposed the discovery motion but provided several pages of redacted transcripts of Sinclair's three overheard conversations and many related documents. Those documents, which included six surveillance authorizations signed by Mitchell, revealed the names of the three F.B.I. Special Agents involved in the White Panther Party surveillance: Kenneth Lee Schriber, James Sullivan, and Charles Wagner. In January of 1979, the plaintiffs sought to amend their complaint to join the three agents as parties defendant in place of the John Doe defendants in the original complaint.

A few months earlier, in November of 1978, the defendants had moved for summary judgment. The plaintiffs opposed that motion as it applied to Mitchell but did not file a Statement of Genuine Issues as required by Local Rule 1–9(h). On February 14, 1979, the district court partially granted the defendants' summary judgment motion dismissing the claims against all remaining defendants except Mitchell. On July 31, 1979, the district court granted Mitchell's motion for summary judgment and denied the plaintiffs' motions for further discovery and for leave to join the three agents as defendants. The plaintiffs appeal from that order. We affirm Judge Gasch's dismissal of the Title III claim against Mitchell and the other defendants then in the lawsuit and his grant of summary judgment in favor of Mitchell but remand for joinder of the new defendants and for further proceedings with respect to both statutory and constitutional claims against those defendants.

## I. CLAIMS AGAINST MITCHELL

In reviewing Judge Gasch's dismissal of the Title III claim and grant of summary judgment on the Fourth Amendment claim, we must take account of the substantial burden that such suits place on present and former federal officials. The Federal Rules of Civil Procedure should be firmly applied, through motions to dismiss and motions for summary judgment, so as to avoid unnecessary trials against such officials. *Butz v. Economou*, 438 U.S. 478, 507–08, 98 S.Ct. 2894, 2911, 57 L.Ed.2d 895 (1978); *Chagnon v. Bell*, 642 F.2d 1248 (D.C.Cir. 1980). The plaintiffs' decision to take no depositions, their failure to file a Statement of Genuine Issues, and the insufficient evidentiary support of their claims from the little discovery they have conducted indicate that the claims against Mitchell were properly dismissed.

### A. *The Title III Claim*

■ Title III of the Omnibus Crime Control and Safe Streets Act of 1968 prohibits, in part, electronic telephone surveillance without judicial warrant. 18 U.S.C. § 2511 (1970). Section 2511(3), however, provides that Title III is not intended "to limit the constitutional power of the President to take such measures as he deems necessary to protect the United States against the overthrow of the Government by force or other unlawful means, or against any other clear and present danger to the structure or existence of the Government."

In its September 27, 1977 memorandum and order, the district court properly concluded that Mitchell authorized the Black Panther Party surveillance for appropriate national security reasons and that he was therefore exempted from Title III's provisions by its national security exemption. As the district court held, Mitchell's liability

under Title III depends upon the terms of the statute—whether the surveillance was intended "to protect the United States against the overthrow of the Government by force." *See Halperin v. Kissinger*, 606 F.2d 1192 (D.C.Cir.1979), *cert. granted*, 445 U.S. 924, 100 S.Ct. 1308, 63 L.Ed.2d 757 (1980). In *Zweibon v. Mitchell*, 516 F.2d 594, 666 (D.C.Cir.1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976) (hereinafter *Zweibon I*), this court narrowly interpreted the national security exemption to exclude only those national security wiretaps that can constitutionally be performed without a warrant. Applied retroactively to this case, *Zweibon I* would prohibit Mitchell from relying on the exemption because *Keith* held that the wiretaps at issue were unconstitutional. However, the *Zweibon I* interpretation of the exemption applies only prospectively. *Zweibon v. Mitchell*, 606 F.2d 1172, 1182 (D.C.Cir.1979), *pet. and cross-pet. for cert. filed*, 48 U.S.L.W. 3404 (Dec. 12, 1979) (hereinafter *Zweibon III*). Accordingly, the Supreme Court's holding in *Keith* does not restrict Mitchell's defense under the national security exemption as long as the surveillance was undertaken for proper national security reasons. *See Chagnon, supra*, at 1260.

■ On the record before us, we agree with the district court that there is no evidence that the Black Panther Party surveillance was undertaken for improper reasons. Mitchell's authorizations for the surveillances recited contacts maintained by Party members with foreign governments and organizations; and, as this court observed in *Halperin, supra*, 606 F.2d at 1204, contacts with foreign representatives provide the clearest justification for a national security exception to Title III. The plaintiffs do not create a genuine issue of fact by merely suggesting that the memoranda might be read to reach a different conclusion. Although the plaintiffs have had their discovery on the Black Panther Party surveillance and their chance to take Mitchell's deposition, they can point to no evidentiary basis for impugning Mitchell's motives. Therefore, given the paucity of evidence

before it, the district court properly dismissed the plaintiffs' Title III claim under the national security exception.

B. *The Fourth Amendment Claim*

The plaintiffs also seek compensation under *Bivens v. Six Unknown Federal Narcotics Agents*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). The district court held that Mitchell was not liable in a *Bivens* action by virtue of the doctrine of qualified immunity that was outlined in *Wood v. Stickland*, 420 U.S. 308, 95 S.Ct. 992, 43 L.Ed.2d 214 (1975), and was applied to federal officials in *Butz v. Economou, supra*. We agree.

■ As stated in *Halperin*, governmental defendants charged with illegal wiretaps

> are entitled to a qualified immunity on both the Fourth Amendment and the Title III claims if they can show that they had reasonable grounds for believing their actions were legal (the "objective basis") and that there was no malice or bad faith in either the initiation or conduct of the wiretapping (the "subjective basis").

606 F.2d at 1208 (footnote omitted). The plaintiffs have provided no facts indicating any genuine issue regarding either the subjective or objective branch of the qualified immunity test upon which Mitchell relies.

■ The objective branch of the qualified immunity test asks only whether the official violated clearly established, authoritatively declared law. *See Procunier v. Navarette*, 434 U.S. 555, 562, 98 S.Ct. 855, 859, 55 L.Ed.2d 24 (1978); *Chagnon, supra*, at 1257–1258. Although the Supreme Court had expressly reserved ruling on this question in *Katz v. United States*, 389 U.S. 347, 358 n. 23, 88 S.Ct. 507, 515 n. 23, 19 L.Ed.2d 576 (1967), at the time of the wiretaps the only federal courts that had addressed the need for a warrant for domestic security wiretaps concluded that they were unnecessary. *See, e. g., United States v. Stone*, 305 F.Supp. 75 (D.D.C.1969), *United States v. O'Baugh*, 304 F.Supp. 767 (D.D.C.1969).

■ It was not until shortly before Mitchell had authorized the last surveillance

at issue here that any federal court ruled that a warrant was required for national security wiretaps, *United States v. Smith*, 321 F.Supp. 424 (C.D.Cal.1971). The Supreme Court did not address the issue until 1972 in *Keith*, which involved these very plaintiffs. For purposes of the qualified immunity, the reasonableness of Mitchell's belief in constitutionality of his authorizations cannot be judged by principles that had not yet been announced. *Chagnon, supra*, at 1258.

Nor have plaintiffs produced any evidence which suggests that Mitchell was not entitled to qualified immunity because he acted in bad faith. Mitchell's authorization memoranda recite adequate facts concerning the surveillance to establish legitimate national security concerns, and the plaintiffs offer nothing in response except mere speculation that those concerns may not have supplied the actual motivation for the wiretaps. Moreover, Mitchell's minimization memoranda, which predated any judicial requirement for them in national security surveillances, prohibited overhearings like those of plaintiff Sinclair's personal conversations in Ann Arbor. The plaintiffs challenge Mitchell's good faith in issuing those minimization memoranda by asserting that damaging evidence might conceivably be discovered if more discovery were to take place, yet the plaintiffs did not submit a Rule 56(f) affidavit requesting further discovery before resolution of the summary judgment motion. In light of the strong evidentiary support for qualified immunity, the continuation of this case against a former high government official after the plaintiffs have failed, for seven years, to produce any evidence would constitute the kind of harassment the Supreme Court criticized in *Butz, supra*. Under these circumstances, the district court quite properly granted Mitchell's motion for summary judgment.

## II. MOTIONS FOR JOINDER OF NEW DEFENDANTS AND FURTHER DISCOVERY

■ The plaintiffs moved in January of 1978 to amend their complaint, substituting the three F.B.I. Special Agents for the John Doe defendants in the initial complaint. Rule 15(a) of the Federal Rules of Civil Procedure provides that leave to amend pleadings "shall be freely given when justice so requires." Only limited circumstances justify a district court's refusal to grant such leave to amend: undue delay, bad faith on the part of the moving party, or undue prejudice to the opposing party. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962).

■ The district court denied the plaintiffs' motion to join the F.B.I. agents as defendants because it found that the timing of the motion prejudiced Mitchell's interests "in the prompt resolution of the claims against him." We reverse that denial and remand for further proceedings against the new defendants. We recognize that there was substantial delay between the receipt of the revealing documents under the Freedom of Information Act and the filing of the motion to amend the complaint, but that delay is insignificant relative to the five-year inability of the FBI to locate the same wiretaps in the F.B.I. indices.

On remand, the plaintiffs should be allowed appropriate further discovery as long as they proceed with due diligence. The three agents may or may not have ignored Mitchell's minimization memoranda, thereby violating the plaintiffs' statutory and constitutional rights; in any event, the plaintiffs should have an opportunity to discover relevant evidence. Although no longer a party, Mitchell may be deposed regarding his knowledge of the White Panther Party surveillance. It is agreed that Mitchell approved that surveillance repeatedly between August 1970 and January 1971. If his deposition or other discovery indicates that Mitchell knew that improper surveillance was being conducted despite his memoranda and nonetheless reauthorized the wiretaps at 30-day intervals, the plaintiffs can seek to reinstate him as a defendant by moving under Fed.R.Civ.Pro. 60(b) for relief from the judgment in Mitchell's favor.

Affirmed in part; reversed and remanded in part.